Memorandum of Decision
On May 3, 1999, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of Brian and Susan H. to their minor daughter, Waryn H. Trial took place in this court on July 10, 11, 12 and 13, 2000. For the reasons stated below, this court now grants the petition.
THE FACTS
The court finds the following facts and credits the following evidence.
A. The Father
The father was forty-seven years old at the time of trial. He completed three years of college and has an extensive employment history. He also has a substance abuse history that dates back to his teenage years. In the early 1990's, the father was twice arrested and convicted of larceny in Virginia.[2] He went to jail for four months and was placed on probation for ten years.
Sometime in 1994, the father, mother, and Waryn moved to Connecticut. On November 16, 1996, the father was arrested for larceny and risk of injury for shoplifting with Waryn. The father was arrested again, this time for larceny and assault, on January 17, 1997. In March, 1997, the father received a one year suspended prison sentence and one year of probation for both incidents.
On November 1, 1996, DCF obtained an order of temporary custody for Waryn after it learned that, in late October, 1996, the father had exposed himself to Waryn when she was lying on a bed. Subsequently, Waryn disclosed numerous other incidents in which the father would masturbate on her, lie on top of her, touch her breasts, look at her genitals, lap CT Page 8968 her face with his tongue or put his tongue in her mouth, and make inappropriate sexual comments. These incidents ranged in time from 1993, when Waryn was seven, to 1997 and 1998, during supervised or unsupervised visits.
On January 16, 1997, the court adjudicated Waryn neglected, committed her to DCF, and imposed expectations on the parents. DCF referred the father to several counseling and substance abuse programs. The father completed couples counseling but failed to complete or attend most of the substance abuse programs. The father tested positive for cocaine in 1997. In January and May, 1998, the father submitted samples for testing that were inconsistent with urine. After one such incident, the father admitted adding water to his urine sample. The father tested positive for cocaine in September, 1998.
Later in September, after Waryn had given a statement to the Milford police about the father's sexual abuse of her, the father left Connecticut for Virginia. There he was found in violation of his Virginia probation and imprisoned until May 22, 2000. At that time he was paroled to Ohio for one year. During this time period, the father sent one letter to Waryn, but otherwise has not seen her and has failed to send her cards or gifts, to make inquiries of DCF or the foster mother about Waryn's well being, or to provide any child support for her. In the meantime, in March, 1999, the Milford police obtained an arrest warrant charging the father with risk of injury to minors and fourth degree sexual assault. The father has not returned to Connecticut to face these charges and failed to appear for this trial.[3]
B. The Mother
The mother, Susan H., was forty-six years old at the time of trial. She lived in many different places as a youth, including overseas, because her step-father was in the military. She attended college, specializing in computer science, and has a long work history in the field of computer consulting services. The mother appeared at trial and testified on her own behalf.
The mother met the father in California in 1983. Out of this nonmarital relationship, Waryn Patricia H. was born on August 16, 1986. Although the mother used cocaine and smoked crack in 1984 and 1985, she claims to have stopped before she became pregnant with Waryn.
The family moved to Virginia in 1990.[4] The mother resumed use of cocaine. At some point in the early 1990's, the mother was arrested for shoplifting, in one of the above-mentioned incidents involving the father, and sent to jail for several months. Again in 1994, the mother CT Page 8969 and father went to jail for several months for larceny. Waryn stayed with a cousin while the parents were in jail.
When the family moved to Connecticut in 1994, the mother's Virginia probation was transferred here. The mother and father continued to smoke crack, sometimes in Waryn's presence. There were times when Waryn had to get food for herself because her parents were high. On occasion, the parents would pick Waryn up from school and then buy drugs.
The mother was smoking crack in the house on the occasion in late October, 1996, when the father was found exposing himself to Waryn in the bedroom. The mother was also present in the house on other occasions when the father committed the sexual acts described above. In one instance, the mother told the father to stop but did not do anything further. In other instances, the mother, father, and Waryn took showers or baths together. At least one of the sexual incidents that the mother witnessed took place during an unsupervised visit in 1997.
In October, 1996 and January, 1997, the mother was arrested for larceny. She was convicted, given a suspended sentence, and placed on probation. The mother made restitution and that probation expired. On December 5, 1996, the mother was found in possession of two crack cocaine pipes. She tested positive for cocaine. This incident resulted in a violation of her Virginia probation which, as a result, was extended three years. The mother is currently on that probation.
After the December 5, 1996 incident, the mother began attending a substance abuse program. She completed the initial program but tested positive for cocaine on three occasions in December, 1996 and January, 1997. The parents completed couples counseling in 1997 and participated in some family counseling in late 1997 and early 1998. The mother participated in another substance abuse program from late 1997 to the latter part of 1998. The mother, however, tested positive for cocaine in November and December, 1997. She tested positive for opiates in May, 1998, when unsupervised visits were taking place.[5] After several missed appointments, the mother submitted a hair sample for a drug test in September, 1998, but the test results were invalid. The mother refused to provide another hair sample.
In March, 1998, the parents married each other and Waryn attended the wedding. In June, 1998, Waryn began to express concerns that her parents might not permit her to go back to her foster home after unsupervised visits. DCF then shortened the visits and made them supervised. The father was more interactive with Waryn at these visits than the mother. In early September, 1998, Waryn disclosed to DCF the sexual abuse that had taken place during the unsupervised visits. DCF decided to permit CT Page 8970 another supervised visit because the mother had promised to give Waryn a laptop computer and some clothes. The mother failed to do so at that visit. At the end of the visit, a "group hug" took place in which the father lapped Waryn's face. DCF then terminated all visits.[6]
In November, 1999, the mother and Waryn participated in a court-ordered psychological "evaluation. The evaluator found that the mother had little insight about child sexual abuse or the impact of her own drug use on Waryn. The mother took no responsibility for any neglect of Waryn and tended to think that Waryn's problems stemmed from foster care and DCF. An interactional session revealed the mother to be relatively oblivious to Waryn's discomfort. The evaluator concluded that the mother's parental rights should be terminated and that Waryn "should have no further contact with her.
The mother remains gainfully employed as a computer analyst. She has not had contact with the father recently. She is in therapy due to the break up of her family. While the mother's psychologist testified that the mother has gained insight into her problems, the psychologist also acknowledged that the mother maintained that she had no knowledge of or any responsibility for the sexual abuse of Waryn and that the mother still does not fully understand the impact on children of parental drug use.
C. Waryn
Given her exposure to sexual abuse, substance abuse, and other criminal activity by her biological parents, Waryn understandably experienced difficulties in foster care. To complicate matters, her first foster placement was not well-suited for her needs. On June 20, 1997, DCF placed Waryn in the foster home of Alice W., a single woman who works in the airlines industry. Waryn has remained there ever since.
At first Waryn, then almost eleven years old, did not communicate and was very mistrustful. She would have nightmares and cry out in her sleep. The court-ordered evaluation in November, 1999 found Waryn to be a "seriously disturbed youngster, conflicted about revealing her painful and abusive history."
Gradually, Waryn began to trust Arlene. While Waryn remains in therapy to address her exposure to abuse, she is now a much more communicative and relaxed girl. She attends church with Arlene and has met many people there. She has had the opportunity to travel with Arlene, including a trip to Arlene's native country of Trinidad. Waryn's talents have now become manifest. She is an honors student in high school, with special aptitude in science. She plays the piano well and sings in a choir that CT Page 8971 has performed in various regional locations, including Carnegie Hall.
Arlene has encouraged phone calls from the maternal grandmother, but Waryn does not speak to her at length. Waryn has repeatedly stated her desire to have no further contact of any kind with her biological parents. She blames her father for sexual abuse and drugs and her mother for failing to protect her. Waryn wishes to be adopted by Arlene, with whom she has become very close. Arlene, in turn, would like to adopt Waryn.
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." General Statutes § 17a-112
(c)(1). The court, however, need not make a reasonable efforts finding "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b [dealing with commitment extension hearings and permanency planning for committed children] that such efforts are not January 14, 1999 at an extension hearing that further efforts to reunify were not appropriate. appropriate." General Statutes § 17a-112 (c)(1). In the present case, the court found on January 14, 1999 at an extension hearing that further efforts to reunify were not appropriate. Accordingly, the first statutory element has been satisfied.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919,722 A.2d 807 (1998); General Statutes § 17a-112 (c)(3). In this adjudicatory phase, the court is ordinarily limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a).
Because there were no amendments in this case, the adjudicatory date is May 3, 1999, the date of filing of the original petitions. The petitions allege the grounds of abandonment against the father, and failure to rehabilitate, acts of commission or omission, and lack of an ongoing parent-child relationship against both parents. The court finds that DCF has proven all grounds by clear and convincing evidence. CT Page 8972
1. Abandonment
General Statutes § 17a-112 (c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of "interest, concern or responsibility' for the welfare of the child." In re MigdaliaM., 6 Conn. App. 194, 208-209, 504 A.2d 533, cert. denied, 199 Conn. 809,508 A.2d 770 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id, 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id., 210.
The father abandoned Waryn when he left Connecticut in September, 1998. While he soon thereafter became incarcerated in Virginia, incarceration alone is neither a complete defense to nor sufficient proof of abandonment. See In re Juvenile Appeal (Docket No. 10155),187 Conn. 431, 443, 446 A.2d 808 (1982). A prisoner must "make use of available though limited resources for contact with a distant child." Id. The father did not do so. He sent only one letter. He did not provide cards, gifts, or support. He did not inquire of DCF or the foster mother about Waryn's well being. This evidence clearly and convincingly establishes that Brian H. abandoned his daughter.
2. Failure to Rehabilitate
The ground of failure to rehabilitate arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112 (c)(3)(B). No dispute exists that the court adjudicated Waryn neglected on January 14, 1997, thus satisfying one element of the statute.
The remainder of the statute requires an inquiry into whether the parent has "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a "responsible position in the life of the child." General Statutes § 17a-112
CT Page 8973 (c)(3)(B). The court should determine the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable "within a reasonable time."' In re Luis C., 210 Conn. 157, 167, 554 A.2d 722 (1989). "In assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue." In re Danuael D., 51 Conn. App. 829, 840, 724 A.2d 546 (1999). The statute, however, does not require parents "to be able to assume full responsibility for [a] child, unaided by available support systems." Inre Juvenile Appeal (84-3), 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984).
Both parents failed to rehabilitate. Despite some substance abuse counseling, both parents continued to use drugs or evade drug testing through September, 1998. The father was arrested several times, incarcerated, and remains subject to arrest again. The father's sexual abuse of Waryn is revolting and reveals a depraved mind. He has now abandoned Waryn. The mother remains on probation as a result of criminal activity in late 1996 and early 1997. The mother participated in some of the sexual acts and knew about others, including some that took lace during visitation. The mother failed to protect Waryn or obtain help for anyone in the family, even after DCF became involved. Instead, she remains in complete denial about sexual abuse.
As a result of their misconduct, the parents' relationship with their child is poor at best and, more probably, nonexistent. Considering Waryn's age and needs, the parents are not able to "assume a responsible position in [her] life. .. ." General Statutes § 17a-112 (c)(3)(B). Accordingly, DCF has proven failure to rehabilitate by clear and convincing evidence.
3. Acts of Commission or Omission
General Statutes § 17a-112 (c)(3)(C) makes it a ground for termination of parental rights when the child "has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being." This provision authorizes termination when "specific acts of parental commission or omission" have caused physical or emotional injury to the child. (Internal quotation marks omitted). See In re Felicia D.,35 Conn. App. 490, 502, 646 A.2d 862, cert. denied, 231 Conn. 931,649 A.2d 253 (1994).[7] The ground does not permit termination "based on speculation as to what acts may befall a child." In re Kelly S.,29 Conn. App. 600, 614, 616 A.2d 1161 (1992). CT Page 8974
The father's repeated sexual abuse of Waryn is the most obvious and egregious act of commission in this case. To the extent that the mother took part in this pattern of molestation by taking baths and showers with Waryn and the father, she perpetrated acts of commission as well. Furthermore, the mother knew what the father was doing and failed to prevent it or at least seek help. Her failure to protect Waryn from sexual abuse qualifies as an act of omission. See In re Tabitha T.,51 Conn. App. 595, 603, 722 A.2d 1232 (1999); In re Felicia D., supra,35 Conn. App. 502. These acts of commission and omission, as well as the parents' drug use in her presence, emotionally injured Waryn in that, according to the court-ordered evaluation, Waryn is a "seriously disturbed youngster, conflicted about revealing her painful and abusive history. Accordingly, the evidence clearly and convincingly establishes the ground of acts of commission and omission.
4. No Ongoing Relationship
The final statutory ground alleged in this case is that there is "no ongoing parent-child relationship, which means the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes § 17a-112 (c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." (Internal citation omitted.) In re Juvenile Appeal (Anonymous), 181 Conn. 638,645, 436 A.2d 290 (1980). "The feelings of the child are of paramount importance. . . The ultimate question is whether the child has no present memories or feelings for the natural parent." (Internal citations omitted.) In re Shane P., 58 Conn. 234 240 ___ A.2d ___ (2000).
In this case, Waryn has repeatedly stated that she desires to have no further contact with her natural parents. She has only negative memories of her life with them. Because of the parents' misconduct and, in the father's case, abandonment, Waryn did not see her parents from September, 1998 through the end of the adjudicatory period. The court accordingly finds the evidence to clearly and convincingly substantiate the ground of no ongoing parent-child relationship against both parents.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that CT Page 8975 "termination is in the best interest of the child." General Statutes § 17a-112 (c)(2). The court can consider all events occurring through the close of the dispositional hearing. See Practice Book § 33-5.
The best interest of Waryn H. strongly favors termination of her parents' rights. After abusing Waryn, the father has now abandoned her. He remains subject to arrest in Connecticut. The mother, while an educated and skilled professional, has fallen victim to drugs and to the harmful behaviors that drugs cause. Her belief that Waryn's problems stem from foster care and DCF involvement rather than her earlier home life reveals the mother's distorted sense of reality. She cannot rehabilitate until she accepts responsibility, which she refuses to do.
The parents' misconduct has destroyed their relationship with Waryn. The proof of this point comes from Waryn herself, who is old enough to make informed decisions about where she would like to live and to express her wishes clearly. Waryn has clearly expressed her desire to remain with her foster mother and to have no further contact with her parents. The court will not ignore these wishes.
Waryn must be a strong girl to have overcome her frightening childhood to the extent that she has. To be sure, Waryn has had help from others. Waryn is lucky that DCF removed her from the abusive home of her natural parents and placed her in the foster care of Arlene W. Arlene has given Waryn someone to trust and taught her that she can trust other adults as well. With her roots now firmly planted in her foster home, Waryn's talents have blossomed like a flower.
Waryn wants to be adopted by Arlene and Arlene wants to adopt her. Although Waryn will be fourteen years old, and thus a minor for only four more years, adoption at this relatively late stage of her youth will give Waryn the stable and secure family life that she never has had. Termination of parental rights will make this adoption legally possible. It is therefore in her best interest.[8]
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112
(e). See In re Tabitha P., 39 Conn. App. 353, 362, 664 A.2d 1168 (1995). These factors serve only to guide this court in making the ultimate decision whether to grant the termination petition and no one finding is a prerequisite. See In re Eden F., 250 Conn. 674, 691, 741 A.2d 873
(1999). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent. CT Page 8976
DCF referred the parents to substance abuse programs and family counseling, facilitated visitation, and arranged for a psychological evaluation of Waryn and the mother. These services were relevant to the parents' needs and offered in a timely manner.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF offered the parents appropriate services and guidance, and sufficient time to permit family reunification.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On January 16, 1997, the court entered the following expectations for the parents to meet to facilitate the return of Waryn to their custody: (1) keep all appointments set by or with DCF, (2) keep whereabouts known to DCF and their attorney, (3) visit the child as often as DCF permits, (4) participate in the following counseling: individual; family, as recommended by individual therapists; parenting; drug and alcohol treatment; and random substance abuse screens, (5) secure and maintain adequate housing and income, (6) refrain from substance abuse, (7) have no involvement in the criminal justice system, and (8) follow all recommendations of treatment providers. The parents' compliance with these expectations was poor, particularly in the critical areas of obtaining substance abuse evaluation and treatment, refraining from substance abuse, and, especially in the father's case, avoiding involvement with the criminal justice system.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Waryn has no positive emotional ties to her natural parents. She is closely attached to her foster mother.
5) The age of the child.
Waryn will be fourteen years old on August 16, 2000.
6) The efforts the parent has made to adjust his circumstances or CT Page 8977 conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that parents did not adjust their circumstances in time to make it in Waryn's interest to return to their home. The parents maintained regular contact with Waryn until September, 1998, when the father left Connecticut and DCF terminated visits.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or pthe unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the parents' difficulties stem primarily from their own lifestyle choices and not from unreasonable interference by each other or any third person, or from economic circumstances.
CONCLUSION
Based upon the foregoing findings, the court hereby grants the termination petition. The Commissioner of DCF is appointed statutory parent for Waryn for the purpose of securing an "adoptive family. The court strongly urges that the current foster mother, Arlene W., be allowed to adopt. The Commissioner shall file with this court no later than 90 days following the date "of judgment a written report of efforts to effect such permanent placement and file further "reports as are required by state and federal law.
It is so ordered.
 Carl J. Schuman Judge, Superior Court